**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHNATHAN EDWARD FLOWERS, | Civil No.   07cv1785 WQH (BLM) |
| Petitioner, | |
| vs. | **REPORT AND RECOMMENDATION RE DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| ROBERT A. HOREL, Warden, | |
| Respondent. | |

I.    <u>INTRODUCTION</u>

Johnathan Edward Flowers, a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging his San Diego County Superior Court convictions in case number SCD175957 for one count of attempted murder, one count of robbery, two counts of attempted robbery, and one count of assault with a semi-automatic firearm.  (Lodgment No. 1 at 0058-63.)  The jury also found he was a principal in the commission of the attempted murder, robberies and attempted robbery and was vicariously armed with a firearm.  (*Id.*)

Flowers contends his federal constitutional rights were violated for the following reasons:  (1) the prosecutor argued false and

inadmissible evidence to the jury; (2) there was insufficient evidence to support his conviction for attempted robbery of Danielle Soto; and (3) the trial court erroneously failed to instruct the jury on the crime of attempted voluntary manslaughter.  (Pet. at 6-8; Pet'rs Mem. of P. & A. [doc. no. 1-2] at 17-24; Pet'rs. Ex. B [doc. no. 1-6]; Pet'rs Ex. C [doc. no. 1-5].)

The Court has considered the Petition, Respondent's Answer and Memorandum of Points and Authorities in Support of the Answer, Petitioner's Traverse, the Lodgments submitted by Respondent, and all the supporting documents submitted by the parties.  Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court recommends that the Petition be **DENIED**.

## II.  <u>FACTUAL BACKGROUND</u>

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  28 U.S.C.A. § 2254(e)(1)(West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness).  The facts as found by the state appellate court are as follows[1]:

> "On July 23, 2000, Danielle Soto, Francisco Lopez and Ivan Rubio traveled to San Diego from Yuma, Arizona with several other friends to visit another friend in San Diego, Soto's father and to buy higher quality marijuana than was available in Yuma.  While visiting her father in Mission Beach, Soto, along with Lopez and Rubio walked to Belmont Park to look for a connection as Soto had heard people walk around that area offering to sell marijuana.  At some point Soto talked with a man wearing an orange-colored shirt, later identified as Harris, telling him they wanted to buy

---

[1] The state court noted that the facts were taken from their opinion in the appeal of Grady Harris, Flowers' codefendant.  (Lodgment No. 6 at 3.)

some weed.  Harris, who was in the area with a man wearing a maroon shirt and braided hair, later identified as Johnathan Flowers, and another man, gave Soto his pager number, which one of them wrote on her arm.

"Several hours later Soto called the pager number from a friend's house in the Rolando area of San Diego.  One of the men she had met called her back and she talked about getting some "weed" before giving the phone to Lopez, who arranged to meet the men at Woodstock Pizza in 10 minutes.  When the men failed to show up to meet Soto, Lopez and Rubio, they returned to the friend's house and called the pager number again.  This time, Lopez made arrangements to meet the men at a near-by 7-Eleven convenience store.  When the three drove to the pre-arranged location, Harris was waiting for them, wearing the same orange shirt as he had been wearing at Mission Beach.  Harris had brought along some marijuana which he rolled into a cigar after buying cigar paper in the 7-Eleven store and sat in the car with Soto and her friends to share it as they drove around the area.  As they cruised, Harris talked with them about "trust" regarding the drug transaction.  When Soto, and Rubio told Harris the marijuana they were smoking was not the quality they wanted, Harris told them they would go some place else to obtain the higher grade marijuana.

"The group went back to the 7-Eleven where Harris's friends, Flowers and the other man from Mission Beach, were waiting in an older model red Mustang.  Harris rode with Soto, Rubio and Lopez and directed them to an alley near some apartments about 15 minutes away while following Flowers and the other man in the Mustang.  When Harris asked Rubio whether he or any of his friends were "cops" or had a gun during the trip, Rubio told him no, they only wanted to buy marijuana.  Flowers and the other man were already in the alley, standing outside the Mustang, when Lopez parked the car there and everyone got out.  Soto got back into the driver's side of the car, while Rubio and Lopez waited outside the car as Harris walked over to speak with [Flowers and his other friend].

"When Harris[, Flowers and the other man] returned to talk with the Arizona group, Lopez told Harris to give them whatever he could of good quality marijuana.  The group basically wanted high quality marijuana from Canada known as 'Chronic' which costs about four or five hundred dollars an ounce.  In response to Harris's question about who had the money, Lopez said it was not him.  Although they had not yet agreed upon a price, Harris told Lopez to have the money ready when he returned.  [Harris stopped briefly to talk with Flowers and the other man.]  Because [Lopez] had a bad feeling about what was happening, [he] gave his wallet containing $400 or $500 to Rubio when Harris left to go to one of the apartments to obtain better marijuana.

"When Harris, Flowers and the third man again approached Lopez and Rubio standing in front of Soto in the car, Harris pulled out a gun from his pocket or waist, pointed it toward Lopez and Rubio, and demanded all their money.  When Lopez said he did not have any money, Harris pointed the gun near Rubio's head, saying "I'm gonna quit bull shitting.  Give me your mother-fucking money."  As Rubio tried to leave while moving Harris's hand and the barrel of the gun away from his head, Harris shot him, g[r]azing his head.  Rubio then began running down the alley.  As he was chased by the third man, Rubio flipped Lopez's wallet out of his back pocket and heard two or three more gunshots.

"Meanwhile, Flowers 'rushed' Lopez, demanding his money, and they started fighting.  When Lopez was on the ground near the car, four or five gunshots were fired at him.  Scared, Lopez slipped out of his shirt which Flowers held and began running away with Flowers and Harris in pursuit.  Soto had taken off running after she witnessed Harris demand money, point the gun at Rubio's head, heard the first shot, and saw Rubio running as Lopez was getting beat up and shot at.

"Soto, Lopez and Rubio were each able to make their way to various nearby houses or apartments where the occupants called police.  Responding police officers found Lopez shaken and in pain.  Both he and Rubio were separately taken by ambulance to Mercy Hospital where they were treated for their wounds.  Lopez told the police officer who accompanied him to the hospital about meeting Harris, Flowers and the third man at Mission Beach and the events that followed.  Lopez was treated for two gunshot wounds, one to his left thigh and the other to his left buttock, a large scrape on the side of his belly, bruises on his lips and left cheek, and a laceration on his forehead.  Rubio was admitted to the intensive care unit where he was treated for a gunshot wound across the right scalp and a laceration and bleeding around the brain.

"Another responding police officer took Soto for a ride through some alleys in the area.  At the 4600 block of 33rd Street she identified a parked red Mustang as the car driven by two of the group's assailants.  She was later interviewed at the hospital by San Diego Police Detective Thomas Boerum who was in charge of the shooting investigation.  He also separately interviewed Lopez and Rubio, obtaining further descriptions of the suspects and versions of the events.  Boerum obtained the Mustang's license plate number from responding officers and a 7-Eleven surveillance tape showing Harris in the orange shirt with two other men, one of whom was Flowers wearing a maroon outfit.  A San Diego State University police officer who overheard the police radio dispatch describing the clothing worn by the suspects involved in the shooting had

contacted the San Diego police officers to tell them about seeing the suspects at the 7-Eleven earlier that evening and the surveillance tape.

"Boerum identified the man in the orange shirt on the surveillance tape as Harris and determined the Mustang was registered to Harris and his girlfriend. [Flowers was identified as the man in the burgundy jumpsuit. Boerum] also determined the pager number Soto had been given on July 23, 2000 belonged to Harris's pager. When he later visited the north alley at 3400 Monroe, he found a watch near some bushes and recovered three .380 shell casings, which are rounds fired from a semiautomatic gun, in the alley.

"In a subsequent search of the apartment Harris had shared with his girlfriend at 4627 33rd Street, other police officers found an orange shirt matching the one Harris wore during the shooting, $260 in a bedroom drawer, and a large maroon shirt and matching pair of maroon pants. A red Mustang was found parked at that address. DNA testing of a blood stain on the shoulder of the orange shirt revealed it was very likely to be Rubio's blood and that a stain on the shirt's inner collar indicated Harris had worn the shirt. A blood stain on the middle right side of the maroon shirt was determined to very likely belong to Lopez and a stain on the inside collar of the shirt indicated Flowers had worn it.

"Harris was subsequently arrested in Michigan [on] October 2002 and returned to San Diego for trial with Flowers as his codefendant. In addition to the above evidence being presented at trial, Rubio identified Harris in court as the person wearing the orange shirt on June 23, 2000, and Flowers as the man in the dark outfit. Lopez also identified Harris as one of the men who talked with Soto at Mission Beach that day and identified photographs of Harris, Flowers and the Mustang as being involved in the incident. Soto identified Harris in court as the man in the orange shirt who gave her the marijuana cigar and shot Rubio and Lopez. She thought Flowers's hairline was similar to the man who had been wearing the burgundy suit that day.

"Soto also testified she never saw an exchange of marijuana for money while she was in the alley, never saw a weapon in Flowers's or the third man's hands, and never heard any arguing between anyone in her group and Harris before he shot Rubio. Neither Lopez or Soto ever saw Harris with a gun at his waistband and Rubio did not see Harris lift his shirt to show him the gun at his waistband before pointing it at him. Although he may have touched Harris's forearm while trying to move the gun away from his head, Rubio testified he never grabbed the gun or struggled with Harris over it.

"[Neither Soto nor Lopez saw Harris or Flowers drinking or carrying a bottle of liquor that night. Neither codefendant appeared to Rubio to be drunk or drinking that night.]

"[Although Flowers did not testify or present any evidence,] Harris testified in his own defense. He admitted that on July 23, 2000 he was at Mission Beach with Flowers and another friend, whom he identified as Raymond Barnes. He also admitted he had met Soto, Lopez and Rubio there, and he had given Soto his pager number after she told him she wanted to buy marijuana and was willing to spend $500. [Harris and his friends had been drinking cognac in Harris's car on the way to Mission Beach. Although he was a bit 'tipsy,' he was in control and not drunk.] A few hours later, Soto paged him and he called back, making a deal to sell her some marijuana for $560 and arranging to meet her and her two friends at a 7-Eleven to consummate the deal. Harris had located the marijuana for $460 and was going to make $100 profit on the transaction. [Flowers and Barnes were not with Harris when he made these calls.]

"After meeting the group at the 7-Eleven, Harris directed them to a location near a friend's home where he was going to pick up the marijuana and also meet Flowers. On the way there, Harris shared a marijuana cigar with Soto and Rubio. They did not complain about the quality of the marijuana. When they arrived at the alley near some apartments, Harris left the group to collect the marijuana from his contact. At that point, Harris was not armed with a gun and had no plans to rob Soto, Lopez and Rubio.

"After obtaining the marijuana, Harris talked with Flowers, who was accompanied by Barnes, telling them to watch Soto, Lopez and Rubio because he did not trust them. When Barnes responded by pulling out a gun, Harris took it from him and placed it in his waistband to avoid any trouble. [At that point, Harris was still feeling some effects of his earlier drinking of the alcohol and thought Flowers seemed 'a little more tipsier than [either he or Barnes, and Flowers did not] seem to be all there.' Harris then gave Rubio the marijuana and Rubio gave him $300. When Harris calmly asked for the other $260 for the deal, Rubio said the marijuana was only worth $300. As Harris pocketed the $300, he calmly said, "You know, I'm not bull-shitting with you. Give me the rest of my money or give me the weed back."

"Harris testified he became angry when Rubio would not either pay him the additional money or return the marijuana. Harris then lifted his shirt to display the gun in his waistband to convince the Arizona group he was not playing and he wanted the rest of the money or the marijuana back. Rubio lunged and grabbed at the gun.

Harris had also grabbed for the gun and Rubio's hand was on his hand gripping the gun. Harris pulled the gun out of his shirt to protect himself. As he struggled for the gun with Rubio, it fired two shots. When Rubio released the gun and ran past him, Harris dropped the gun and it went off a third time as it hit the ground. Harris was surprised when the gun fired because he did not intend to pull the trigger or try to shoot Rubio, he was merely defending himself. Harris also did not see where Lopez was during the struggle for the gun or see him do anything after the gun was discharged. Harris denied chasing after Rubio or Lopez. Rather he immediately returned to the Mustang with Flowers and Barnes after the gun fired and drove home. Harris noticed his watch was missing when he got home and testified it was the watch recovered by Detective Boerum in the alley behind 3400 Monroe in July 2000.

"On cross-examination, Harris conceded he had not been threatened by Rubio or Lopez during the incident and that he had not been afraid [for] his life when he lifted his shirt to display the gun. Harris also acknowledged he was not trying to protect either Flowers [sic] Barnes's life during the event. Harris claimed only to go for the gun because Rubio had reached for it.

"A San Diego Police Department supervising criminalist testified in rebuttal regarding the operation of a semiautomatic firearm like the one used in this case. He testified the trigger of the gun must be pulled backwards each time before it will fire, that if the slide of the gun were held tightly by two people it would not fire more than once, and that there is generally not enough force applied when there is a struggle for a gun for it to discharge. The criminalist also stated that a .380 semiautomatic as used here was not "drop sensitive" unless something was wrong with the gun. He noted that the fact there were three .380 shell casings found in the alley where the shooting occurred indicated the gun was properly functioning."

(Lodgment No. 6 at 3-11.)

## III. PROCEDURAL BACKGROUND

On November 18, 2003, the San Diego County District Attorney charged Nathan Edward Flowers and Grady Obi Harris with two counts of attempted murder in violation of California Penal Code ("Penal Code") sections 187(a) and 664 (counts one and two), one count of robbery in violation of Penal Code section 211 (count three), two counts of

attempted robbery in violation of Penal Code sections 211 and 664 (counts four and five), and two counts of assault with a semi-automatic firearm in violation of Penal Code section 245(b) (counts six and seven). (Lodgment No. 1 at 0022-29.) The District Attorney also alleged in the consolidated information that Flowers was vicariously armed with a firearm, within the meaning of Penal Code section 12022(a)(1), during the commission of the attempted murders, robbery, and attempted robberies. (*Id.*) She also alleged that Flowers had four prior felony convictions for which he had been denied probation, within the meaning of Penal Code section 1203(e)(4), a prior conviction for which he served a prison sentence, within the meaning of Penal Code sections 667(b) and 668, a prior conviction which was a serious felony, within the meaning of Penal Code sections 667(a)(1), 668 and 1192.7(c), and a prior conviction which constituted a "strike" under California's three strikes law, within the meaning of Penal Code sections 667(b) through (i), 1170.12 and 668. (*Id.*)

Following a jury trial, Flowers was convicted of all counts except for the attempted murder charged in count one (victim Ivan Rubio). (*Id.* at 0058-66). The jury also found true the allegations that Flowers had been vicariously armed. (*Id.*) After a bench trial following the verdicts, the trial judge found beyond a reasonable doubt that Flowers had suffered the prior convictions alleged in the consolidated information. (*Id.* at 0186.) The judge sentenced Flowers to twenty-five years and four months in custody. (*Id.* at 0139-40.)

Flowers appealed his conviction to the California Court of Appeal for the Fourth Appellate District, Division One. (Lodgment No. 3.) In an unpublished opinion filed August 26, 2005, the state appellate court affirmed Flowers' conviction but, for a variety of reasons,

reduced his sentence to nineteen years.   (Lodgment Nos. 6, 9.) Flowers filed a Petition for Review in the California Supreme Court, which that court denied without citation of authority.  (Lodgment No. 8.)

Flowers then filed a habeas corpus petition in the San Diego Superior Court, which was denied in an unpublished written opinion on July 24, 2006.  (Lodgment Nos. 10, 11.)  Thereafter he filed a habeas corpus petition in the California Court of Appeal, which the court denied in an unpublished written opinion filed on September 7, 2006.  (Lodgment Nos. 12, 13.)  Finally, Flowers filed a habeas corpus petition in the California Supreme Court.  (Lodgment No. 14.)  The court denied the petition, citing *In re Dixon*, 41 Cal. 2d 756 (1953). (Lodgment No. 15.)

Flowers filed a habeas corpus Petition pursuant to 28 U.S.C. § 2254 in this Court on September 10, 2007 [doc. no. 1].  Respondent filed an Answer and a Memorandum of Points and Authorities in Support of the Answer to the First Amended Petition on April 4, 2008 [doc. no. 13], and Flowers filed a Traverse on May 15, 2008 [doc. no. 16].

**IV.   DISCUSSION**

**A.   Scope of Review**

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States.</u>

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).  As amended, 28 U.S.C. § 2254(d) reads:

-9-

07cv1785

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was <u>adjudicated on the merits</u> in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1)-(2) (West 2006) (emphasis added).

"[The Anti Terrorism and Effective Death Penalty Act] establishes a 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Womack v. Del Papa*, 497 F.3d 998, 1001 (9th Cir. 2007) (quoting *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002)). To obtain federal habeas relief, Flowers must satisfy either § 2254(d)(1) or § 2254(d)(2). *See Williams v. Taylor*, 529 U.S. 362, 403 (2000). The Supreme Court interprets § 2254(d)(1) as follows:

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).

In order for a petitioner to satisfy § 2254(d)(2), he or she must demonstrate that the factual findings upon which the state court's adjudication rests are objectively unreasonable. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *see also Rice v. Collins*, 546 U.S.

333, 341–42 (2006) (the fact that "[r]easonable minds reviewing the record might disagree" does not render a decision objectively unreasonable). This Court will presume that the state court's factual findings are correct, and Petitioner may overcome that presumption only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). A state court, however, need not cite Supreme Court precedent when resolving a habeas corpus claim. *Early v. Packer*, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.*

        **B.   <u>Analysis</u>**

Flowers alleges the following claims in his petition. In claim one, he argues that his federal due process rights were violated when the prosecutor knowingly argued false and inadmissible evidence to the jury. In claim two, he contends his federal due process rights were violated when insufficient evidence was presented to support his conviction for the attempted robbery of one of the victims, Danielle

Soto.   Finally, in claim three, he argues that the trial court's
failure to instruct the jury on the lesser included offense of
attempted voluntary manslaughter violated his Sixth Amendment right
have the jury determine every element of the offense.  (*See* Pet. at
6-9; Pet'rs Ex. B, C.)

Respondent contends that claim one is procedurally defaulted
because the California Supreme Court invoked the *Dixon* bar in response
to Flowers' habeas corpus petition, or, in the alternative, that the
state appellate court's resolution of the claim was neither contrary
to, nor an unreasonable application of, clearly established Supreme
Court law.  (*See* Mem. P. & A. Supp. Answer to Pet. 12-14.)   As to
claim two, Respondent argues that the state court's resolution of the
claim was neither contrary to, nor an unreasonable application of,
clearly established Supreme Court law.  (*Id.* at 14-17.)   Finally,
Respondent alleges that in claim three, Flowers fails to state a
federal question and, in the alternative, the state court's resolution
of an "identical claim" was neither contrary to, nor an unreasonable
application of, clearly established Supreme Court law.  (*Id.* at 17-
19.)

In his traverse, Flowers contends that claim one is not
procedurally defaulted because the state appellate court addressed the
merits of his claims.  (Traverse at 2.)   Further, Flowers argues that
the state court's denial of claim two was based upon an unreasonable
determination of the facts.  (*Id.* at 7-9.)

1.   <u>Improper Argument to the Jury (Claim One)</u>

Flowers claims his due process rights were violated when the
prosecutor referred to false and inadmissible evidence in his closing
argument, namely testimony by a police officer regarding the source

of money found in Harris' apartment. Specifically, Flowers claims the judge sustained an objection to this testimony, directed the jury to disregard it, and directed the prosecutor not to refer to it in his closing argument. (Pet. at 6; Pet'rs Ex. C.)

The facts surrounding this claim are as follows. Officer Donald Williams, an officer involved in the initial investigation of the shooting, testified he received a description of a red Mustang thought to have been involved in the shooting. He discovered a Mustang matching the description and went to the address listed for the registered owner, Jamila Carey. (Lodgment No. 2, vol. 5 at 674-75.) He spoke to Carey, Harris' common law wife, and an individual named Ronald Harris and searched the apartment. (*Id.* at 676-77.)

During the search, Williams located clothing which matched the description of the clothes worn by two of the assailants and two hundred and sixty dollars in cash. (*Id.* at 677-84.) The prosecutor then asked Williams, "Without telling me what [Carey] said, did she tell you where the money came from," to which Williams replied, "Grady Harris." (*Id.* at 686.) Defense counsel objected, and the judge sustained the objection, struck the testimony from the record and instructed the jury to disregard it. (*Id.*)

In a discussion held outside the presence of the jury during which defense counsel asked for a mistrial, the judge offered to admonish the jury again not to consider the testimony and give another limiting instruction. (*Id.* at 692-695, 699-706.) Counsel agreed to write the instruction and the judge agreed to give it. (*Id.* at 705.) The judge permitted the prosecutor to argue the "neutral fact that there was some money found . . . in a drawer, period." (*Id.* at 706.) During closing argument, the prosecutor, referring to the evidence

supporting Flowers' guilt, stated that "[t]here was money in Mr. Grady Harris' home in close proximity to the clothes that he left behind when he left San Diego." (Lodgment No. 2, vol. 7 at 1045.) In his rebuttal, he also referred to the "$260 in Jamila's drawer," stating that "the guy that stole the wallet and ran with it from the alley knows how much money was in it because he had it counted later to divvy it up amongst the three robbers and leave some for his common law wife Jamila . . . ." (Lodgment No. 2, vol. 7 at 1141.)

Flowers exhausted this claim by raising it in a habeas corpus petition he filed in the California Supreme Court. (*See* Lodgment No. 14.) That court denied the claim, citing to *In re Dixon*, 41 Cal. 2d 756 (1953). (*See* Lodgment No. 15; Mem. of P. & A. in Supp. Answer at 12-13.)

a.   *Procedural Default*

A habeas petition is procedurally defaulted when the last reviewing state court dismissed it for failure to comply with a state rule of procedure. *Trest v. Cain*, 522 U.S. 87 (1997); *Lambright v. Stewart*, 241 F.3d 1201, 1205 (9th Cir. 2001). When the procedural rule is independent of federal law and adequate to support the judgment, federal review of the claims is barred unless the petitioner can demonstrate either cause for the default and actual prejudice resulting from the alleged constitutional violations, or that failure to consider the claims will result in a fundamental miscarriage of justice. *Carter v. Giurbino*, 385 F.3d 1194, 1196-97 (9th Cir. 2004) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). Procedural default is an affirmative defense, and once the respondent has adequately pled the existence of independent and adequate state procedural grounds, the burden to place that defense in issue shifts

to the petitioner. *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir 2003). The ultimate burden of proving procedural default, however, belongs to the respondent. *Id.*

Respondent asserts that because the California Supreme Court rejected this claim citing *Dixon*, the claim is procedurally barred. (*See* Mem. of P. & A. in Supp. Answer at 12-13.) The *Dixon* bar prohibits the use of habeas corpus as a substitute for the appeal process and explains that "in the absence of special circumstances constituting an excuse for failure to employ that remedy, the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction." *Dixon*, 41 Cal. 2d at 759. Here, Flowers did not assert this prosecutorial misconduct argument in his direct appeal (Lodgment Nos. 3, 7), but merely raised it in his state habeas petition (Lodgment 14).

Respondent argues that the *Dixon* bar is an adequate and independent state ground to bar federal review. Mem. of P. & A. in Supp. Answer at 12-13. "To be deemed adequate, the state law ground for decision must be 'well-established and consistently applied.'" *Bennett*, 322 F.3d at 583; *see also Poland v. Stewart*, 169 F.3d 573, 585 (9th Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 424 (1991)) ("A state procedural rule constitutes an adequate bar to federal court review if it was 'firmly established and regularly followed' at the time it was applied by the state court"). "For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law." *La Crosse v. Kernan*, 244 F.3d 702, 704 (9th Cir. 2001) (citing *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)). "A state law ground is so interwoven if 'the state has made application of the procedural bar depend on an

1    antecedent ruling on federal law [such as] the determination of

2    whether federal constitutional error has been committed.'" *Park*, 202

3    F.3d at 1152 (quoting *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985)).

4        In *Bennett*, 322 F.3d at 582-83, the Ninth Circuit held that the

5    *Dixon* bar was not interwoven with federal law, and as such, is

6    independent.  Moreover, the Court previously has found the <u>Dixon</u> bar

7    to be adequate.  *See Protsman v. Pliler*, 318 F. Supp. 2d 1004, 1014

8    (S.D. Cal. 2004); *see also Gerardo v. Scribner*, 2007 WL 628014, *10

9    (S.D. Cal. 2007) (finding *Dixon* rule to be adequate where petitioner

10   failed to satisfy burden of placing the defense "in issue" after the

11   state affirmatively pled *Dixon* procedural bar).  Because Respondent

12   has pled that the state court imposed an adequate and independent

13   state procedural bar to deny claim one, this Court may not review the

14   claim unless Flowers demonstrates that the *Dixon* bar is not an

15   adequate and independent state ground, or that this Court may somehow

16   excuse his default.  *See  Wells v. Maas*, 28 F.3d 1005, 1008 (9th Cir.

17   1994).

18       In his Traverse, Flowers states as follows:

19       Ground One of the petition is not procedurally defaulted as
         the California Court of [A]ppeal denied the claim on its
20       merits in a reasoned denial.  This constituted the last
         reasoned decision of the state courts.  *Ylst v. Nunnemaker*,
21       501 U.S. 803-04 (1991) (unexplained denials by state courts
         are not entitled to deference, but are presumed to adopt
22       the last "reasoned" decision of the lower state court).
         The court's determination that Petitioner's counsel did not
23       object and that not argue facts outside of evidence [sic]
         constituted an unreasonable determination of the facts
24       pursuant to 28 U.S.C.

25   (Traverse at 1-2.)  While Flowers is correct that *Ylst* directs federal

26   courts to "look through" a silent denial to the last reasoned state

27   court decision as the basis for its analysis under 28 U.S.C. § 2254,

28   the Supreme Court's decision in this case was not silent.  (Lodgment

-16-

No. 15.)  The Supreme Court decision cited to *Dixon* and this citation must be considered for procedural default allegations.  *Carter*, 385 F.3d at 1197 (one-sentence summary denial of petition incorporating unelaborated case citation sufficient for procedural default). Flowers does not provide any other challenge to the adequacy or independence of the *Dixon* bar and this Court's review of the record and the relevant authorities fails to provide any such support.  See Protsman, 318 F. Supp. 2d at 1008, 1014 (finding Dixon bar independent and adequate).  Accordingly, this Court finds that the Dixon bar is an adequate and independent state procedure barring federal review of Flower's first claim.  *Bennett*, 322 F.3d at 586.

> **b.   *Cause and Prejudice***

In light of Flower's procedural default, this Court may only reach the merits of claim one if Flowers can demonstrate either cause and prejudice, or actual innocence.  *See Wells*, 28 F.3d at 1009. "'Cause' under the cause and prejudice test must be something <u>external</u> to the petitioner, something that cannot fairly be attributed to him…."  *Coleman*, 501 U.S. at 753 (emphasis in original); *see also McCleskey v. Zant*, 499 U.S. 467, 497 (1991) (explaining that "cause" requires a showing of some external impediment such as "government interference or the reasonable unavailability of the factual basis for the claim").

Flowers offers nothing in his Petition or Traverse to suggest there was cause for the default.  *Coleman*, 501 U.S. at 750.  Nor has he demonstrated actual prejudice he may have suffered as a result of the alleged violation of federal law.  *Id.*  Indeed, it appears to this Court that no due process violation occurred because the prosecutor did not argue false or inadmissible evidence to the jury.  The trial

court ruled Officer Williams' testimony that Carey told him Harris was the source of the money found in Harris' apartment was inadmissible, but concluded the simple fact that money was found at Harris' apartment in close proximity to clothes worn by Harris and Flowers was relevant and admissible.  He also permitted the prosecutor to argue these facts and the reasonable inferences which could be drawn from them.  (Lodgment No. 2, vol. 5 at 686, 701, 705-06.)  The prosecutor complied with the court's ruling, stating in closing argument "[t]here was money in Mr. Grady Harris' home in close proximity to the clothes that he left behind when he left San Diego" and asked the jury on rebuttal to draw the reasonable inference that the two hundred and sixty dollars in Carey's drawer was from Harris.  (Lodgment No. 2, vol. 7 at 1045, 1141.)  He did not refer to Williams' stricken testimony that Carey told him the money came from Harris.[2]

    c.    *Fundamental Miscarriage of Justice*

    Flowers also has failed to demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.  *See Coleman*, 501 U.S. at 750.  The Supreme Court has limited the "miscarriage of justice" exception to petitioners who can show that "a constitutional violation has probably resulted in one who is actually innocent."  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

---

    [2] Respondent also argues the claim fails on the merits because the California appellate court's denial of the claim, which Flowers also raised in a habeas corpus petition he filed in that court, was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Mem. of P. & A. in Supp. Answer at 13-14.) For the reasons discussed in this section of the Report and Recommendation (Section IV(B)(1)(b)-(c)), the Court agrees the claim fails on the merits.  Moreover, for the same reasons, the Court concludes that, contrary to Flowers' assertion, the state court's denial of the claim was not an unreasonable determination of the facts.

"Actual innocence" means factual innocence, not merely legal insufficiency; a mere showing of reasonable doubt is not enough. *See Wood v. Hall*, 130 F.3d 373, 379 (9th Cir. 1997).  As discussed above, the Court concludes that the prosecutor did not commit constitutional error in his closing argument.  Moreover, Flowers has not demonstrated that he is actually innocent of the crimes of which he has been convicted.

Accordingly, and for the foregoing reasons, the Court concludes that claim one should be **DISMISSED** as procedurally barred.  *See Bennett*, 322 F.3d at 586.

   2.   Sufficiency of Evidence (Claim Two)

Flowers argues that there was insufficient evidence presented to support his conviction for the attempted robbery of Danielle Soto because there was no evidence that any demand for money was made of her and none of the necessary acts to support an attempted robbery conviction were directed at Soto.  (Pet. at 7; Pet'rs Ex. C at 30-46.) Respondent counters that the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Answer at 14-17.)

Flowers raised this claim in his petition for review filed in the California Supreme Court on direct appeal.  (Lodgment No. 7.)  That court denied the claim without citation of authority.  (Lodgment No. 8.)  Accordingly, this Court must "look through" the state supreme court's denial to the state appellate court's opinion as the basis for its analysis.  *Ylst*, 501 U.S. at 801-06.

In analyzing this claim, the state appellate court first outlined the standard of review under California law for a sufficiency of the evidence claim, stating that the court must determine "whether from

07cv1785

the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." (Lodgment No. at 20, quoting *People v. Crittenden*, 9 Cal. 4th 83, 139, fn. 13 (1994)) (internal quotation marks omitted.)   The state court noted that its duty was not to "reweigh the evidence," but rather to "simply consider[] whether '*any* rational trier of fact could have found the essential elements of [the charged offense] beyond a reasonable doubt.'" (*Id.*, quoting *People v. Rich*, 45 Cal. 3d 1036, 1081 (1998)) (internal quotation marks omitted) (emphasis in original.)   Applying this standard, the court stated as follows:

> With regard to the crime of attempted robbery, we note that "[r]obbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) An attempt connotes the intent to accomplish its object. (*People v. Smith* (1997) 57 Cal.App.4th 1470, 1481.) "The intent or intention is manifested by the circumstances connected with the offense." (§ 21, subd. (a).) In other words, an attempt to commit the crime of robbery occurs when there is a specific intent to commit a robbery and a direct but ineffectual act is done toward its commission. (See § 21, subd. (a); CALJIC Nos. 9.40, 6.00; *People v. Dillon* (1983) 34 Cal.3d 441, 452-452.) Although the act required must be more than mere preparation, showing that the perpetrator is putting his or her plan into action, it "need not be the last proximate or ultimate step toward commission of the [robbery]. [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 376.) Where the intent to commit the crime is clearly shown, an act done toward the commission of such crime may be sufficient for an attempt even though it would be insufficient if the intent is not as clearly shown. (*People v. Staples* (1970) 6 Cal.App.3d 61, 68.) An intent to rob may be proved by inferences from all of the circumstances of the case. (*People v. Vizcarra* (1980) 110 Cal.App.3d 858, 863 (*Vizcarra*).)
>
> Here, the record before the jury, viewed in accordance with the above rules, showed Soto was the person who initiated the drug transaction by first contacting Harris who was with Flowers and another man at Mission Beach, obtaining Harris's pager number, having it written on her arm, and then later paging Harris from her friend's house. When the first attempt to meet failed, Soto, together with

Lopez and Rubio, again paged Harris to arrange a different meeting place. When Harris did meet the group, Flowers and the other man were nearby in a separate car which they drove to an alley where Harris directed the Arizona group to drive to after being assured they were not "cops" and they did not have any guns. On the way, Soto smoked a marijuana cigar with Harris.

Once in the alley, Harris told Lopez, as Rubio and Soto waited next to Lopez at their car, to have the money ready when he returned with the marijuana. Although Soto was sitting in the car when Harris returned and approached the group with Flowers and the other man, he had no marijuana. Rather he announced he was "gonna quit bullshitting," pulled out a gun, pointed it toward Lopez and Rubio who were standing in front of the car, and demanded all their money. Hearing and seeing this, Soto became frightened, and when the events began to quickly unfold with Harris shooting at Rubio and Flowers attacking Lopez and also demanding money, she managed to run from the area.

Based on these facts, the jury could reasonably find that Flowers, as well as Harris, intended to rob the group from Arizona, including Soto. In addition to being instructed on robbery (CALJIC No. 9.40), aiding and abetting robbery (CALJIC No. 9.40.1) and the specific intent and fear necessary for a robbery (CALJIC Nos. 9.40.2, 9.41), the jury was also instructed with CALJIC No. 6.00, which told it that:

> "An attempt to commit a crime consists of two elements, namely a specific intent to commit the crime, and a direct but ineffectual act done toward its commission. In determining whether this act was done, it is necessary to distinguish between mere preparation, on the one hand, and the actual commencement of the doing of the criminal deed, on the other. Mere preparation, which may consist of planning the offenses or of devising, obtaining or arranging the means for its commission, is not sufficient to constitute an attempt. However, acts of a person who intends to commit a crime will constitute an attempt where those act[s] clearly indicate a certain, unambiguous intent to commit that specific crime. These acts must be an immediate step in the present execution of the criminal design, the progress of which would be completed unless interrupted by some circumstance not intended in the original design."

Applying these instructions to the facts, the jury could have reasonably inferred that but for Soto's escape,

because she had been lured to the alley along with Rubio and Lopez by the prospect of buying marijuana from Harris and his friends and was in close proximity to them when Harris, Flowers, and the other man forcibly took money from Rubio then attempted to do so from Lopez, that Flowers along with Harris and the other man also intended to forcefully take money or property from Soto.

Contrary to Flowers's argument there was no evidence Soto was a victim of an attempted robbery because she was not chased and there was no testimony of any direct acts by him, Harris or the other man to take property from her, it is not necessary that the gun be directly pointed at her or that a demand for her money or property be made because the circumstances here showed the attempted robbery of Soto had not yet progressed to that point. (See *Vizcarra*, *supra*, 110 Cal.App.3d at p. 863.) Because the evidence revealed Flowers, Harris and the other man clearly intended to rob the group of its money and committed more than mere preparation in doing so when they confronted Rubio and Lopez directly in front of the car in which Soto was sitting, a jury could reasonably find that a robbery of Soto would have taken place but for her escape, an event which interrupted Harris's original plan in which Flowers and the other man aided and abetted.  Thus the trial court properly denied Flowers's section 1118.1 motion with regard to the attempted robbery of Soto and the evidence is sufficient to support the jury's verdict.

(Lodgment No. 6 at 20-24.)

In assessing a sufficiency of the evidence claim, the Supreme Court has stated that "'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  In determining whether sufficient evidence has been presented, the Court must accept the elements of the crime as defined by state law.  *See Jackson*, 443 U.S. at 324, n. 16.

The standard by which the state court adjudicated Flowers' sufficiency of the evidence claim is essentially the same as that stated in *Jackson*.  Accordingly, the state court's denial was not

"contrary to" clearly established Supreme Court law.  *See Williams*, 529 U.S. at 412; *Early*, 537 U.S. at 8.

The state court's denial of the claim also was not an unreasonable application of *Juan H.* and *Jackson*.  As the state court noted, robbery is defined in California as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (Cal. Penal Code § 211) (West 2008).  Further, "[a]n attempt to commit a crime is comprised of 'two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission.'" *People v. Medina*, 41 Cal. 4th 685, 681 (2007) (quoting Cal. Penal Code §§ 21a, 664.)  "Other than forming the requisite criminal intent, a defendant need not commit an element of the underlying offense." *Id.* at 682 (citing *People v. Superior Court (Docker)*, 41 Cal. 4th 1 (2007); *People v. Dillon*, 34 Cal. 3d 441, 453-54 (1983); *People v. Jones*, 75 Cal. App. 4th 616, 627 (1999).)

The leading California case on the question whether a defendant can be convicted of attempted robbery when he does not actually come in contact with the victim is *People v. Bonner*, 80 Cal. App. 4th 759 (2000).  In *Bonner*, the defendant, a former employee of a hotel, knew the manager and assistant manager took cash and checks from the week's business to the bank and walked a particular route through the hotel's garage.  Using this information, Bonner planned to rob the manager and assistant, but was interrupted by other employees while waiting in the garage for the manager and assistant manager to pass by.  *Id.* at 761-62.  Bonner was convicted of attempted robbery of both the manager and assistant manager.  On appeal, he argued he could only be convicted of one count of attempted robbery because until he was in the actual

presence of the victims, it was impossible to determine how many people he would have attempted to rob.  *Id.* at 764-65.

The California court rejected the notion that Bonner could not be convicted of two counts of attempted robbery because he was not in proximity to either of the victims.  The court concluded there was sufficient evidence that Bonner planned to rob two victims and took steps beyond mere preparation to accomplish those robberies.  The fact that some intervening event prevented him from accessing his victims did not change those facts.  "Multiple counts of attempt can arise from a single act which goes beyond mere preparation" so long as there is sufficient evidence the defendant had multiple purposes.  *Id.* at 766-67.

In the present case, as the state court found, the evidence, when viewed in the light most favorable to the prosecution, was sufficient to lead a "'rational trier of fact [to find] the essential elements of [the attempted robbery of Soto] beyond a reasonable doubt.'"  *Juan H.*, 408 F.3d at 1275 (quoting *Jackson*, 443 U.S. at 319).  Harris lured all three victims into the alley where Flowers and another man were waiting.  (Lodgment No. 2, vol. 4 at 350-55.)  Harris had a conversation with Flowers and the other man just before Harris returned, pointed a gun at Rubio and Lopez them and demanded their money.  (*Id.* at 364-69.)  After Harris shot Rubio, Flowers began hitting Lopez, and Harris later shot him.  (*Id.* at 372.)  Lopez began to run away and Flowers chased him.  (*Id.* at 375.)  Soto witnessed these events from the driver's seat where she was sitting.  (Lodgment No. 2, vol. 3 at 226.)  When she saw the flashes from the gun muzzle, she got out of the car and ran.  (*Id.* at 235.)

A jury could reasonably infer from these facts that Harris and

07cv1785

1  Flowers had the multiple purpose of robbing Rubio, Lopez and Soto but
2  that, like the defendant in *Bonner*, the plan with respect to Soto was
3  thwarted when she ran away.  As evidenced by their attack on both
4  Rubio and Lopez and their demand of money from both, neither Harris
5  nor Flowers was sure who had the drug money.  (*See* Lodgment No. 2,
6  vol. 4 at 363-64; vol. 4 at 537.)  They also did not know that Soto,
7  as she testified, did not have any money.  (Lodgment No. 2, vol. 3 at
8  249.)  Since the obvious purpose of Harris' and Flowers' attack was
9  to obtain money and/or valuables, there is no logical reason why they
10  would rob Rubio and Lopez but would not rob Soto of any money or
11  valuable she possessed had she not run away.

12      For the foregoing reasons, the Court concludes that the state
13  court's denial of this claim was neither contrary to, nor an
14  unreasonable application of, clearly established Supreme Court law.
15  *Williams*, 529 U.S. at 412-13.  Flowers is not entitled to relief as
16  to this claim.

17      3.  <u>Jury Instruction Error (Claim Three)</u>

18      Finally, Flowers alleges the trial court violated his Sixth
19  Amendment right to have a jury determine every element of an offense
20  when it failed to sua sponte instruct the jury on the lesser included
21  offense of attempted voluntary manslaughter of Lopez.[3]  (Pet. at 8;
22  Pet'rs Ex. B at 19-40.)  Respondent argues Flowers has not stated a
23  cognizable federal claim and, in the alternative, the state court's
24  denial of the claim was neither contrary to, nor an unreasonable
25  application of, clearly established Supreme Court law.  (Answer at 17-
26  29.)

27

28      [3] The jury acquitted Flowers of the attempted murder of Rubio.  (*See*
Lodgment No. 1, vol. 1 at 0058.)

a.    *Failure to Present a Cognizable Federal Claim*

To present a cognizable federal habeas corpus claim under § 2254, a state prisoner must allege both that he is in custody pursuant to a "judgment of a State court," *and* that he is in custody in "violation of the Constitution or laws or treaties of the United States."  *See* 28 U.S.C. § 2254(a).  Moreover, district courts have a duty to liberally construe pro se filings.  *Zichko v. Idaho*, 247 F.3d 1015, 1020 (9th Cir. 2001).  Flowers is in custody and he clearly alleges that his Sixth Amendment rights were violated by the trial court's actions.  Accordingly, Respondent's claim that Flowers does not state a cognizable federal claim is without merit.

b.    *Merits*

Flowers raised this claim in his petition for review filed in the California Supreme Court, which that court denied without citation to authority.  (*See* Lodgment Nos. 7, 8.)  Accordingly, this Court must "look through" to the California appellate court's opinion denying the claim as the basis for its analysis.  *Ylst*, 501 U.S. at 801-06. Stating that under both California and United States Supreme Court law the trial court must sua sponte instruct on a lesser included offense "only if there is substantial evidence to raise a question as to whether all of the elements of the charged offense are present," the state court concluded that Flowers was not entitled to an instruction on attempted voluntary manslaughter of Lopez.  (Lodgment No. 6 at 12-14, citing *Hopper v. Evans*, 456 U.S. 605, 611 (1982).)  According to the state court, in California, voluntary manslaughter may arise from either an act of unreasonable self-defense or a killing during a sudden quarrel or a heat of passion.  (*See* Lodgment No. 6 at 14-15.) Flowers contended in state court, as he does here, that the trial

07cv1785

court should have instructed the jury on attempted voluntary manslaughter of Lopez under either theory.  (*See* Pet. at 8; Pet'rs. Ex. B at 18-40.)  In analyzing Flowers' claim, the state court wrote:

A.  *Heat of Passion*

Flowers argues he was entitled to an instruction on the heat of passion and sudden quarrel theory of attempted voluntary manslaughter because there was ample evidence his codefendant Harris's passions were aroused by a sudden quarrel over the marijuana transaction and Rubio's aggressive and provocative act of reaching for the gun at Harris's waistband.  We disagree.

"An intentional, unlawful [attempted] homicide is 'upon a sudden quarrel or heat of passion' [citation], and thus is [attempted] voluntary manslaughter [citation], if the [attempted] killer's reason was actually obscured as a result of a strong passion aroused by a 'provocation' sufficient to cause an '"ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment."' [Citations.]" (*Breverman*, *supra*, 19 Cal.4th at p. 163.)  To satisfy the objective or reasonable person element of this form of voluntary manslaughter, the accused's heat of passion must be due to sufficient provocation by the victim.  (*People v. Steele* (2002) 27 Cal.4th 1230, 1253.)  Slight provocation is not sufficient to reduce an attempted murder to attempted manslaughter. (*People v. Lee* (1994) 28 Cal.App.4th 1724, 1732.)

In this case there was no evidence of provocation by Lopez, and Flowers does not allege any provocative act by him.  Rather, Flowers claims Rubio provided the provocative act by grabbing for the gun in Harris's waistband when it was displayed to him after the group refused to either pay Harris more money or return the marijuana.  Although the testimony of one witness can constitute substantial evidence requiring the court to instruct on its own initiative (*Lewis*, *supra*, 25 Cal.4th at p. 646), we cannot find on this record that Harris's testimony provided such substantial evidence.  Even under Harris's version of the events which are relied upon by Flowers, there was no sudden quarrel when Harris "calmly" asked the group for the extra money or marijuana back.  Moreover, Harris was the initial aggressor, threatening Rubio and Lopez with the gun.  The only evidence that there was a struggle for the gun was Harris's statements that Rubio reached for the gun and had his hand on Harris's hand when Harris pulled out the gun.  We do not believe Rubio's act of attempting to avoid injury from the gun meets the standard required of a provocative act by the victim Lopez which would reduce an attempted murder to attempted voluntary manslaughter.  Nor does the fact that Lopez fought back when attacked by

Flowers as he demanded money provide the provocation. Accordingly, no substantial evidence supported a voluntary manslaughter instruction based on heat of passion or sudden quarrel with regard to the count 2 attempted murder of Lopez.

*B.   Imperfect or Unreasonable Self-Defense*

Relying on *Viramontes*, *supra*, 93 Cal.App.4th 1256, Flowers additionally argues that as a matter of law the record contains substantial evidence to support an attempted voluntary manslaughter instruction based on imperfect or unreasonable self-defense because it contained evidence sufficient to warrant instructions on self-defense. His argument is similar to the one made by the defendant in *People v. Rodriguez* (1997) 53 Cal.App.4th 1250 which was rejected because it was purely a legal one, no request for the instruction had been made, and there was no evidence to support "a theory of an honest but unreasonable belief in the need to kill in self-defense." (*Id.* at p. 1272.) Although Flowers's codefendant Harris testified he pulled the gun to protect himself from Rubio reaching for it, his testimony does not provide any support for self-defense or imperfect self-defense instructions as to Lopez. Even if such testimony arguably showed Harris believed he had a need to defend himself against Rubio, there was no evidence either Harris or Flowers unreasonably believed in the need to defend themselves against Lopez.

Flowers's reliance on *Viramontes* is misplaced. The court in *Viramontes* noted the subjective elements of self-defense and imperfect self-defense are the same because a defendant "must actually believe in the need to defend himself against imminent peril to life or great bodily injury" and concluded "if the evidence is sufficient to support instruction on self-defense, it is also sufficient to support an instruction on imperfect self-defense. [Citations.]" (*Viramontes*, *supra*, 93 Cal.App.4th at pp. 1262-1263.) However, the court also evaluated the evidence in the record which showed there was sufficient evidence to support the giving of both perfect and imperfect self-defense instructions. (*Id.* at pp. 1263-1264.) Such is not true in this case.

Neither Harris nor Flowers requested the jury be instructed on unreasonable or imperfect self-defense. Nor has Flowers cited any evidence in the record that would support unreasonable self-defense as to Lopez. According to his codefendant's testimony, Harris was not threatened by Lopez and did not see him or know what he was doing during the struggle for the gun with Rubio. Nor was there any evidence that Lopez made any threats or actions toward Harris or Flowers before he was attacked by Flowers while Harris was shooting at Rubio. As Rubio ran from the area, Harris shot two or more times at Lopez whom Flowers had wrestled to the ground. Lopez only acted defensively to

1
2
3
4
5
6

escape without suffering further injury during the encounter. The mere fact the trial court decided to give the series of self-defense instructions over the prosecutor's objection, does not provide substantial evidence to instruct sua sponte on unreasonable self-defense with regard to the attempted murder of Lopez. There was simply no evidence from which the jury could infer that Flowers or his codefendant Harris unreasonably believed they had to defend themselves against Lopez. No instructional error is shown.

7    (Lodgment No. 6 at 16-19.)

8    There is no clearly established Supreme Court law which requires

9    a trial court to instruct on a lesser included offense in non-capital

10   cases. *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *Turner*

11   *v. Marshall*, 63 Fl.3d 807, 819 (9th Cir. 1995) (overruled on other

12   grounds by *Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999) (en

13   banc)). Flowers cannot obtain federal habeas relief on this claim in

14   the absence of clearly established Supreme Court law. *See Carey v.*

15   *Musladin*, 549 U.S. 70, __, 127 S. Ct. 649, 654 (2006).

16   In the context of a trial court's failure to give an instruction

17   on a theory of the defense, however, the Ninth Circuit has noted that

18   "[u]nder the Due Process Clause of the Fourteenth Amendment, criminal

19   prosecutions must comport with prevailing notions of fundamental

20   fairness . . . [which] require that criminal defendants be afforded

21   a meaningful opportunity to present a complete defense." *Bradley v.*

22   *Duncan*, 315 F.3d 1091, 1098-99 (9th Cir. 2002) (citing *Mathews v.*

23   *United States*, 485 U.S. 58, 63 (1988) and *California v. Trombetta*, 467

24   U.S. 479, 485 (1984)). Thus, a "'[f]ailure to instruct on the defense

25   theory of the case is reversible error if the theory is legally sound

26   and evidence in the case makes it applicable.'" *Clark v. Brown*, 450

27   F.3d 898, 904-05 (9th Cir. 2006) (quoting *Beardslee v. Woodford*, 358

28   F.3d 560, 577 (9th Cir. 2004)); *Solis v. Garcia,* 219 F.3d 922, 929

(9th Cir. 2000); *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984) (stating that "[a] criminal defendant is entitled to adequate instructions on his or her theory of defense") (quoting *James v. Reese*, 546 F.2d 325, 327 (9th Cir. 1976).) However, the Supreme Court has recognized "that due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." *Hopper v. Evans*, 456 U.S. 605, 611 (1982) (emphasis in original).

The prosecution contended that Flowers was guilty of the attempted murder of Lopez because Flowers aided and abetted Harris in the robbery or attempted robbery of Lopez, the natural and probable consequence of which was the attempted murder of Lopez. (*See* Lodgment No. 1, Supp. Clerk's Tr., vol. 1 at 0028-32.) Thus, the extent of Flowers' liability depended to a large degree on what the jury concluded as to Harris' liability. Harris testified he displayed the gun to Rubio in an attempt to convince Rubio to pay Harris the correct amount of money for the marijuana, Rubio grabbed the gun, and they struggled over it. (Lodgment No. 2, vol. 6 at 806-18.) Rubio was shot accidentally during the struggle and Lopez was shot when the gun hit the ground and went off. (*Id.* at 814-19.) Flowers' defense was threefold. First, he contended that he did not aid and abet a robbery because he, like Harris, only intended to participate in a marijuana sale. Second, Flowers claimed that even if Harris intended to rob the victims, Flowers was too intoxicated to form the appropriate intent to aid and abet. Third, Flowers contended that he did not know Harris had the gun. (Lodgment No. 2, vol. 7 at 1062-80.)

Given Harris' testimony, there was not sufficient evidence to support an instruction on a heat of passion defense with regard to

Lopez.   Harris did not testify he shot Lopez as a result of a provocation or sudden quarrel.   Rather, he testified that Lopez was shot accidentally when Rubio grabbed for the gun, they struggled, the gun hit the ground and it discharged, hitting Lopez.   (Lodgment No. 2, vol. 6 at 808-19.)   Rubio's alleged provocative act of reaching for the gun cannot be imputed to Lopez.

Similarly, although the jury was instructed on self defense, Harris did not testify that he shot Lopez in a honest but unreasonable belief in the need to defense himself or Flowers.   Indeed, according to Harris, Lopez was simply in the wrong place at the wrong time when the gun dropped during his struggle with Rubio and accidentally shot Lopez.   (Lodgment No. 2, vol. 6 at 806-18.)   Moreover, as the state court noted, there was no testimony establishing Lopez did anything to Harris or Flowers which required them to defend themselves with lethal force.   (*Id.* at 819.)   Only Rubio was alleged to have done so when he reached for the gun in Harris' waistband.   As the state court correctly found, this is not sufficient to support an attempted voluntary manslaughter instruction.   Accordingly, Flowers' Sixth Amendment right to have the jury decide every element of the offense was not violated by the failure to give an attempted voluntary manslaughter instruction.   *See Hopper*, 456 U.S. at 611.

For the foregoing reasons, the Court concludes that the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13. Flowers is not entitled to relief as to this claim.

/ / /

/ / /

**V.    CONCLUSION AND RECOMMENDATION**

The Court submits this Report and Recommendation to United States District Judge William Q. Hayes under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.  For the reasons outlined above, **IT IS HEREBY RECOMMENDED** that the Court issue an Order:  (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS ORDERED** that no later than <u>**August 15, 2008,**</u> any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than <u>**September 5, 2008**</u>.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).


DATED:   <u>July 25, 2008</u>


                                        BARBARA L. MAJOR
                                        United States Magistrate Judge


COPY TO:

HONORABLE WILLIAM Q. HAYES
U.S. DISTRICT JUDGE

ALL COUNSEL AND UNREPRESENTED PARTIES